IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| **GOLDFINCH LABORATORY, P.C.,** | ) | Case No. 4:24-cv-168 |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **IOWA PATHOLOGY ASSOCIATES, P.C. AND REGIONAL LABORATORY CONSULTANTS P.C.,** | ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Goldfinch Laboratory, P.C. ("Goldfinch") brings this Complaint against Iowa Pathology Associates, P.C. ("IPA") and Regional Laboratory Consultants, P.C. ("RLC"). Plaintiff Goldfinch seeks injunctive relief, damages, and its attorneys' fees based on (a) the concerted action by IPA and RLC to suppress competition in the market for pathology services, and the submarket for dermatopathology services, in central Iowa in violation of §1 of the Sherman Act, 15 U.S.C.§1, and the Iowa Competition Law, Iowa Code, §553.4 and (b) the attempt by IPA and RLC to establish and maintain a monopoly in those markets in violation of §2 of the Sherman Act, 15 U.S.C. §2, and the Iowa Competition Law, Iowa Code, §553.5.  In support of this Complaint, Goldfinch respectfully alleges as follows:

## PARTIES

1. Plaintiff Goldfinch Laboratory, P.C. is a professional corporation located at 4637 121st Street in Urbandale, Iowa 50323.  It was incorporated under the law of the State of Iowa on January 25, 2022. Through its pathologists, Goldfinch provides dermatopathology and other pathology services for patients in central Iowa whose physicians refer specimens to Goldfinch for diagnoses.

2. Defendant Iowa Pathology Associates, P.C. is a professional corporation located at 1212 Pleasant Street in Des Moines, Iowa 50309. It is incorporated under the laws of the State of Iowa. IPA is an independent laboratory that, through its pathologists, provides dermatopathology and other pathology services for patients in central Iowa whose physicians refer specimens to IPA for diagnoses. Defendant Regional Laboratory Consultants is a separately incorporated professional services corporation that is an affiliate of IPA and that is comprised of the same pathologists as the pathologists at IPA. IPA and RLC share their profits with each other.

3. Goldfinch is owned by four pathologists – Tiffani Milless, M.D.; Caitlin Halverson, M.D.; Renee Ellerbroek, M.D.; and Jared Abbott, M.D. Each of these physicians practices pathology exclusively at Goldfinch.

4. Prior to January of 2023, each of these physicians practiced pathology exclusively at IPA. However, on October 26, 2022, they orally advised IPA of their intent to leave IPA and to form a professional corporation that would provide dermatopathology and other pathology services for patients. On November 10, 2022, these pathologists gave formal written notice of their intent to leave IPA early in 2023.

5. Goldfinch began providing dermatopathology services and other pathology services for patients whose specimens were referred by physicians on February 1, 2023.

## JURISDICTION AND VENUE

6. The acts and practices of defendants challenged in this action are in, and affect, interstate commerce (a) because the equipment and reagents used by both plaintiffs and defendants have traveled in interstate commerce; (b) because some of the specimens analyzed by the pathologists at both Goldfinch and IPA are sent in interstate commerce; and (c) because all parties have contracts with multi-state insurance companies and with Medicare.

7. This Court has subject matter jurisdiction over Goldfinch's Sherman Act claims under 15 U.S.C. §§4 and 16 and under 28 U.S.C. §§1331 and 1337.

8. This Court has supplemental jurisdiction over Goldfinch's state law claims under 28 U.S.C. §1367.

9. This Court has personal jurisdiction over defendants IPA and RLC because both corporations are located in this District and regularly provide services in this District.

10. Venue is proper in this District under 15 U.S.C. §22 and 28 U.S.C. §1391 because both defendants are headquartered in this District and all of the conduct challenged in this litigation took place in this District.

## THE CHALLENGED CONDUCT

11. Prior to the formation of Goldfinch, IPA was the only independent pathology practice in central Iowa that was not exclusively tied to one source of referrals. It was the only independent pathology practice in central Iowa that offered dermatopathology services. Indeed, IPA has acknowledged that it had no competition prior to the departure of the pathologists who formed Goldfinch.

12. There were, and are, pathologists at the University of Iowa, but these pathologists largely confine their practices to providing services for patients of physicians at the University and provide very few services in central Iowa. At the University of Iowa, there are three dermatologists who provide dermatopathology services on a part-time basis, but these dermatologists largely confine their practices to providing dermatopathology services for patients of physicians affiliated with the University of Iowa.

13. On October 26, 2022, the four pathologists who formed Goldfinch advised IPA and RLC orally of their intention to leave IPA and to form a pathology practice with emphasis on the provision of high quality dermatopathology and other pathology services for patients whose

3

specimens were referred to Goldfinch by independent physicians who were not required by contract or otherwise to refer to a mandated entity.

14. Prior to the autumn of 2022, IPA and RLC had been concerned that some of the pathologists associated with those two corporations might seek to establish a competitive pathology practice. Indeed, since 2021, these two corporations had sought to require each of those pathologists to sign the Employment Agreement attached as Exhibit 1.

15. Signature of the Agreement was demanded by IPA and RLC acting in concert with one another. The four pathologists who formed Goldfinch refused to sign the Agreement, but they were strongly pressured to sign the Agreement. Indeed, IPA and RLC repeatedly badgered the four pathologists to try to get them to say that the Agreement had taken effect even though they hadn't signed the Agreement. The administrator of these corporations told these pathologists that the Agreement was in effect even though they had not signed it.

16. Paragraph 6 of the Agreement is entitled "NONCOMPETITION." It provides, in pertinent part, that, for one year following termination of the employment of a physician, that "Physician shall not compete with Employer by providing services under contract or other arrangement, either directly or indirectly, to or on behalf of, a competing pathology program withing twenty-five (25) miles of the current location of Employer at 1212 Pleasant St., Des Moines, Iowa, unless Employer consents in writing." Although the pathologists who formed Goldfinch did not sign the Agreement, the pressure put on them to sign the Agreement demonstrates the anticompetitive animus of the defendants.

17. As the heading "NONCOMPETITION" explicitly indicates, the purpose of this provision was to prevent the formation of a pathology practice that would compete with IPA and RLC for the provision of pathology services within the greater Des Moines area. And to the extent

that pathologists formerly associated with IPA and RLC would be prohibited from practicing pathology in the greater Des Moines area, their ability to compete for pathology services in all of central Iowa would be entirely suppressed.

18. The noncompetition clause of the Agreement was not limited to prohibiting use of confidential IPA or RLC information -- or any other legitimate business interest. Rather, its sole purpose was to attempt to prevent the formation of a pathology practice that would compete with IPA and RLC for referrals of pathology specimens from sources that were not bound by contract or otherwise to refer specimens only to one specified provider of pathology services.

19. In January of 2023, while the pathologists who formed Goldfinch were still employed by IPA and RLC, the Federal Trade Commission proposed a rule that would ban non-compete clauses. In so doing, the Commission stated that such clauses "prevent new businesses from forming, stifling entrepreneurship, and prevent novel innovation." *See* Proposed 16 C.F.R. §910 et seq. §910.2(a), https:/www.ftc.gov/news-events, 88 Fed Reg. 3482 et seq. (Jan. 19, 2023). The proposed rule declares it to be "an unfair method of competition for an employer to enter into or attempt to enter into a non-compete clause with a worker." The proposed rule defines "worker" to include doctors and business executives. A final rule declaring most covenants not to compete to be anticompetitive and unlawful was issued by the Commission on April 23, 2024 and published in the Federal Register on May 7, 2024 (89 Fed. Reg. 38342). *See* 16 C.F.R. Part 910.

20. As the Chair of the FTC, Lina M. Khan, stated in issuing the proposed rule, "The freedom to change jobs is core to economic liberty and to a competitive, thriving economy." Indeed, noncompete agreements are particularly contrary to public policy where, as here, they deprive patients of access to highly qualified physicians.

21.     In a statement accompanying issuance of the proposed rule, the FTC stated that noncompete clauses "hinder innovation and business dynamism in multiple ways – from preventing would be entrepreneurs from forming competitive businesses, to inhibiting workers from bringing innovative ideas to new companies. This ultimately harms consumers; in markets with fewer new entrants and greater concentration, consumers can face higher prices – as seen in the health care sector."

22.     The on-going campaign by IPA and RLC to get the four pathologists who gave notice of their intent to form a new pathology practice to sign the NONCOMPETITION agreement was only the beginning of their efforts to suppress competition in the market for pathology services, and the submarket for dermatopathology services, in central Iowa and the on-going attempts by IPA and RLC to monopolize those markets.

23.     Specifically, although IPA represented to an Iowa state court and to the public that the four pathologists who had announced their intention to form a competing practice were employed by IPA through January 31, 2023, IPA and RLC barred these pathologists from coming to the office and thus prevented them from practicing pathology. In this manner, they sought to give the impression to potential sources of referral of dermatopathology and other pathology specimens that these pathologists were no longer practicing. Moreover, the lock-out prevented these pathologists from maintaining on-going relations with potential referral sources. In so doing, IPA and RLC risked compromising patient care by preventing these pathologists from completing their cases, communicating critical cancer results, and utilizing appropriate testing modalities.

24.     In addition, IPA refused to share biopsy slides with Goldfinch pathologists when those slides were required for continuity of care of the patient -- even though this practice was

contrary to the standard of care and could well have caused harm to patients. Once again, this was an effort to induce referral sources not to make referrals to Goldfinch.

25. IPA and RLC, and the pathologists who comprise those corporations, have made, and continue to make, several false and deceptive statements designed to dissuade referral sources from making referrals to Goldfinch. For example, they have assured several physician practices that Goldfinch would not exist in a year due to legal problems. The apparent purpose of these statements was to try to dissuade referral sources from establishing a relationship with Goldfinch.

26. Similarly, IPA has told referral sources that they cannot send outpatient clinical biopsies to Goldfinch because IPA held the exclusive contract for such biopsies -- when in fact that was not true. For example, IPA told the leadership of Unity Point Clinic that that Clinic could not refer specimens to Goldfinch based on a supposed exclusive contract between IPA and the Clinic -- when, in fact, there is no contract between IPA and Unity Point Clinic. Similarly, IPA has told Gabrielson Clinic in Webster City that its lawsuit against Goldfinch would prevent Goldfinch from operating effectively.

27. In addition to making false and deceptive statements designed to suppress competition and to monopolize the relevant market, IPA has engaged in other unfair practices. For example, at least one partner of IPA, or that partner's spouse, has posted negative Google reviews falsely stating that Goldfinch pathologists are immoral and poorly trained.

28. Another example of false and deceptive statements by IPA designed to suppress competition by Goldfinch is IPA's representations to at least one referral source, and most likely to other referral sources, that these referral sources should not let Goldfinch handle their clinical pathology specimens, including blood and culture specimens, because Goldfinch would delay in the reporting of results.

7

29. IPA also has also told potential referral sources that Goldfinch isn't legally allowed to exist or that Goldfinch won't last long or be a stable business. It has also falsely stated to these sources that Goldfinch's practice is limited to dermatopathology.

30. Further, IPA has falsely stated to clients that Goldfinch has no courier service and that Goldfinch has no ability to interface with the clients' electronic medical record. As with all of the other false and deceptive statement and unfair business practices, the purpose of these statements was to try to drive Goldfinch out of business or, at a minimum, to cripple its ability to compete for referrals from sources that are not obligated to refer to one specific provider of pathology services.

31. The efforts by IPA and RLC to suppress competition in the market for pathology services, and the submarket for dermatopathology services, in central Iowa and their attempts to monopolize those markets are on-going and continuing. These efforts have severely undercut the ability of Goldfinch to compete effectively in those markets and has the potential to harm patients.

## THE MONOPOLY POWER OF IPA AND RLC

32. Prior to the departure of the pathologists who formed Goldfinch, IPA and RLC had, as their counsel recently has acknowledged, monopoly power in the market for pathology services, and in the submarket for dermatopathology services, in central Iowa. On December 31, 2022, they had nearly 100% of the pathologists in central Iowa who were not associated with a single private practice group that confined itself to serving the physicians in that one group. At that time, IPA and RLC had 100% of the dermatopathologists in central Iowa. As a result, these two corporations were able to charge supracompetitive prices for their services.

33. For example, IPA and RLC have a contract with Central Iowa Hospital Corporation for pathology services covered by Part A of Medicare for $1.4 million per year. This fee is in the top 5% of Part A contracts in the United States. Indeed, an administrator of Central Iowa Hospital

Corporation stated that its consultant had advised that its payments to RLC were in the top 1% of similar contracts in this country.

34. Similarly, IPA and RLC charge rural hospitals at least 400% of the actual Medicare fee schedule amount for the technical component of pathology services for Medicare patients. Likewise, they charge the Veterans Administration hospital in Des Moines substantially above the Medicare benchmark rates.

35. If IPA and RLC succeed in destroying or crippling the competitive efforts of Goldfinch through the anticompetitive, unfair, and deceptive practices set forth above, they will have succeeded in suppressing competition in, and in attempting to monopolize the market for, pathology services and the submarket for dermatopathology services in, central Iowa. The result has been, and will continue to be, fees for general pathology services, and for dermatopathology services, in excess of competitive levels in those markets – and thereby to harm patients and other payors for those services.

36. Goldfinch estimates that, as a direct result of the anticompetitive, unfair, and deceptive practices set forth above, it has lost several contracts with referral sources that would otherwise have referred specimens to Goldfinch   More specifically, Goldfinch estimates that it has incurred a loss of more than $3,340,000 as the proximate result of these practices.

## CLAIMS FOR RELIEF

### COUNT I
Violation of Section I of the Sherman Act,
15 U.S.C § 1

37. Plaintiff Goldfinch repeats and incorporates by reference each of the other paragraphs of this Complaint.

38. Defendants IPA and RLC have engaged in a continuing combination and conspiracy to restrain trade in the market for pathology services, and in the submarket for dermatopathology services, in central Iowa --in violation of § 1 of the Sherman Act, 15 U.S.C.§ 1.

39. In furtherance of this unlawful combination and conspiracy, IPA and RLC have engaged in numerous anticompetitive acts, including, but not limited to the following:

   a. Seeking to require all pathologists who were associated with these corporations to sign a NONCOMPETITION agreement that would entirely prohibit them from practicing pathology in the greater Des Moines area and would thus cripple their ability to provide pathology services in central Iowa;

   b. Locking the pathologists who formed Goldfinch out of their offices while they were still employed by IPA so that potential referral sources would believe that they had abandoned their professional duties and patient care responsibilities;

   c. Refusing to share biopsy slides with the pathologists at Goldfinch when required for continuity of care -- all in an effort to subvert competition by Goldfinch;

   d. Falsely representing to potential clients of Goldfinch that Goldfinch would not exist in a year;

   e. Telling potential source referrals of pathology specimens that these sources could not refer specimens to Goldfinch because IPA held exclusive contracts with these referral sources – when, in fact, IPA did not always have contracts with these potential referral sources;

   f. Having at least one of their pathologists, or the spouse of that pathologist, post reviews on Google falsely stating that the pathologists at Goldfinch are immoral and poorly trained -- where there was absolutely no basis for such statements;

    g.    Falsely representing to potential referral sources that Goldfinch might lose their specimens and delay in reporting results;

    h.    Falsely telling potential referral sources that Goldfinch wasn't legally allowed to exist;

    i.    Falsely telling potential referral sources that Goldfinch has no courier service; and

    j.    Falsely stating that Goldfinch pathologists practice only dermatopathology when in fact they practice all facets of pathology.

40. Defendants' unlawful conduct has severely suppressed competition in the market for pathology services, and the submarket for dermatopathology services, in central Iowa. It has enabled defendants to charge supracompetitive prices for pathology services and has caused direct and substantial injury to Goldfinch. There is no competitive justification for the conduct of defendants.

41. The conduct of defendants set forth in this Complaint violates § 1 of the Sherman Act. Goldfinch has standing to pursue its claims under this Section.

42. As a direct and proximate result of defendants' unlawful conduct, Goldfinch has been injured in its business and property and suffered damages in an amount to be proven at trial.

## COUNT II
### Violation of the Iowa Competition Law, Iowa Code 2024 § 553.4

43. Plaintiff Goldfinch repeats and incorporates by reference each of the foregoing paragraphs of the Complaint.

44. The actions of defendants set forth above "restrain or monopolize trade or commerce in a relevant market", *i.e.*, the market for pathology services, and submarket for dermatopathology services, in central Iowa, in violation of Iowa Competition Law § 553.4.

11

45. Goldfinch has been, and continues to be, injured by the conduct set forth above under § 553.12 of the Iowa Competition Law. Goldfinch has standing to recover its damages resulting from this conduct and to recover the necessary costs of bringing this suit.

46. As a direct and proximate result of defendants' past and continuing violation of § 553.4 of the Iowa Competition Law, competition for the delivery of dermatopathology and other pathology services in central Iowa has been suppressed. Goldfinch has been injured in its business and property and has suffered damages in an amount to be proven at trial.

### COUNT III
### Violation of § 2 of the Sherman Act, 15 U.S.C. § 2

47. Plaintiff Goldfinch repeats and incorporates by reference each of the above paragraphs.

48. The false, deceptive, and unfair conduct of IPA and RLC set forth in this Complaint constitutes an attempt, and also a conspiracy, by these entities to monopolize the market for pathology services, and the submarket for dermatopathology services, in central Iowa -- in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

49. Goldfinch has standing to bring the action. As a direct and proximate result of defendants' past and continuing violation of § 2 of the Sherman Act, 15 U.S.C. § 2, Goldfinch has been injured in its business and property and suffered damages in an amount to be proven at trial, and defendants have been able to charge supracompetitive prices for their services.

### COUNT IV
### Violation of Iowa Competition Law, § 553.5

50. Plaintiff Goldfinch repeats and incorporates by reference each of the above paragraphs.

51. The false, deceptive, and unfair conduct of IPA and RLC set forth above constitutes an "attempt to establish or establish, maintain, or use a monopoly of trade or commerce" in the market for pathology services, and the submarket for dermatopathology services, in Central Iowa "for the purpose of excluding competition or of controlling, fixing, or maintaining prices" in violation of the Iowa Competition Law, § 553.5.

52. As a direct and proximate result of defendants' past and continuing violation of § 553.5 of the Iowa Competition Law, Goldfinch has been injured in its business and property and has suffered damages in an amount to be proven at trial. Therefore, Goldfinch has standing to bring this action.

## PRAYER FOR RELIEF

WHEREFORE, Goldfinch requests relief and prays for judgment against defendants IPA and RLC as follows:

a. An award of damages in an amount to be determined at trial or by the Court;

b. An injunction enjoining defendants from engaging in the wrongful and unlawful acts described herein;

c. An order for such declaratory relief as may be appropriate;

d. An award of the costs of the lawsuit, including reasonable attorneys' fees and expenses; and

e. An award of such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Goldfinch hereby demands a jury trial of all triable issues.

/s/ Sarah K. Franklin
Sarah K. Franklin, AT0009630
Margaret A. Hanson, AT0011866
Spencer Willems, AT0014087
DENTONS DAVIS BROWN PC
215 10th Street, Suite 1300
Des Moines, IA 50309
Telephone: 515-288-2500
Email: sarah.franklin@dentons.com
Email: margaret.hanson@dentons.com
Email: spencer.williems@dentons.com

Jack R. Bierig *(Pending Pro Hac Vice Admission)*
ArentFox Schiff LLP
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: 312-258-5511
Email: jack.bierig@afslaw.com

ATTORNEYS FOR PLAINTIFF