IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| GOLDFINCH LABORATORY, P.C., <br><br> Plaintiff, <br> v. <br><br> IOWA PATHOLOGY ASSOCIATES, P.C. and REGIONAL LABORATORY CONSULTANTS, P.C., <br><br> Defendants. | No. 4:24-cv-00168-RGE-HCA <br><br> ORDER GRANTING DEFENDANTS' MOTION TO DISMISS |

**I.    INTRODUCTION**

Plaintiff Goldfinch Laboratory, P.C. sues Defendants Iowa Pathology Associates, P.C. and Regional Laboratory Consultants, P.C. for alleged antitrust violations under the Sherman Act and the Iowa Competition Law. Goldfinch is comprised of four pathologists who previously worked for Defendants. Goldfinch argues actions between IPA and RLC constitute a conspiracy to monopolize pathology and dermatopathology services within central Iowa. Goldfinch also alleges attempted monopolization by Defendants for these services within central Iowa. Defendants move to dismiss Goldfinch's claims. Goldfinch resists. On October 7, 2024, the Court heard oral argument from the parties concerning the motion to dismiss.

For the reasons set forth below the Court grants Defendants' motion.

**II.    BACKGROUND**

**A.    Factual Background**

The Court accepts the facts alleged in Goldfinch's complaint as true for the purpose of considering Defendants' motion to dismiss. *See Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014).

Goldfinch is owned by four pathologists. Compl. ¶ 3, ECF No. 1. These pathologists

worked for Defendants prior to forming and working at Goldfinch. *Id.* ¶¶ 4–5, 19. While they were still working for Defendants, Goldfinch pathologists advised IPA of their intentions to leave and form a separate professional corporation that would provide competing pathology and dermatopathology services. *Id.* at 4. Goldfinch began providing pathology and dermatopathology services around three months later. *Id.* at 5.

Goldfinch asserts IPA was the only independent pathology practice in "central Iowa" prior to the formation of Goldfinch. *Id.* ¶ 11. Specifically, Goldfinch asserts that prior to its formation, Defendants "had nearly 100% of the pathologists in central Iowa who were not associated with a single private practice group that confined itself to serving the physicians in that one group" and "100% of the dermatopathologists in central Iowa." *Id.* ¶ 32. Goldfinch, however, does not define in its complaint what "central Iowa" encompasses. Other pathologists exist in central Iowa outside of IPA and Goldfinch—such as those at the University of Iowa—but they "largely confine their practices to providing services for patients of physicians at the University and provide very few services in central Iowa." *Id.* ¶ 12.

Because of a dearth of pathologists in central Iowa, Goldfinch alleges Defendants "were able to charge supracompetitive prices for their services." *Id.* ¶ 32. For example, Goldfinch asserts Defendants "charge rural hospitals at least 400% of the actual Medicare fee schedule amount for the technical component of pathology services for Medicare patients" and charge the "Veterans Administration hospital in Des Moines substantially above the Medicare benchmark rates." *Id.* ¶ 34. In addition, Goldfinch states Defendants "have a contract with Central Iowa Hospital Corporation for pathology services" within "the top 5% of Part A contracts in the United States." *Id.* ¶ 33. Per an administrator at the hospital, payments under this contract are "in the top 1% of similar contracts in the country." *Id.*

Goldfinch alleges various acts by Defendants constitute anticompetitive behavior in violation of Federal and Iowa law. First, Goldfinch contends Defendants pressured the four

pathologists comprising Goldfinch to sign an "EMPLOYMENT AGREEMENT" which contained a "NONCOMPETITON" clause while they still worked for Defendants. *Id.* ¶ 14–18; Ex. 1 Employ. Agree. ¶ 6, ECF No. 1-1. The noncompetition clause prevents signing-employees from providing competing pathology services for one year within twenty-five miles of IPA's location. ECF No. 1 ¶ 16; ECF No. 1-1 ¶ 6(A). Goldfinch pathologists did not sign this employment agreement. ECF No. 1 ¶ 16.

Next, Goldfinch alleges Defendants "locked-out" Goldfinch pathologists from Defendants' office and thus prevented them from practicing pathology while Goldfinch pathologists were still working for Defendants. *Id.* ¶ 23. Goldfinch also asserts IPA "refused to share biopsy slides with Goldfinch pathologists when those slides were required for continuity of care of . . . patient[s] . . . ." *Id.* ¶ 24. Goldfinch alleges these actions prevented its pathologists from maintaining relationships with potential referral sources and were intended to "induce referral sources not to make referrals to Goldfinch." *Id.* ¶¶ 23–24.

Goldfinch also alleges Defendants have made "several false and deceptive statements designed to dissuade referral sources from making referrals to Goldfinch." *Id.* ¶ 25. These statements include IPA telling potential referral sources: 1) "Goldfinch would not exist in a year due to legal problems;" 2) not to use Goldfinch because they "would delay in the reporting of results;" and 3) that "Goldfinch's practice is limited to dermatopathology." *Id.* ¶¶ 25, 28–29. Goldfinch also alleges Defendants falsely claimed to have exclusive contracts with referral sources which would prevent those referral sources from sending outpatient biopsies to Goldfinch. *Id.* ¶ 26. Goldfinch, by way of example, explains IPA "told the leadership of Unity Point Clinic . . . [it] could not refer specimens to Goldfinch based on a supposed exclusive contract between IPA and the Clinic." *Id.* Goldfinch additionally alleges "IPA . . . told Gabrielson Clinic in Webster City that its lawsuit against Goldfinch would prevent Goldfinch from operating effectively." *Id.* Goldfinch asserts IPA has also falsely told IPA's "clients that Goldfinch has no courier service and that

3

Goldfinch has no ability to interface with the clients' electronic medical record." *Id.* ¶ 30. Finally, Goldfinch alleges one of IPA's partners or their spouse posted "negative Google reviews falsely stating that Goldfinch pathologists are immoral and poorly trained." *Id.* ¶ 27.

Additional facts are discussed below as necessary.

### B.     Procedural Background

In December 2022, Defendants filed claims against the individual pathologists comprising Goldfinch in the Iowa District Court for Polk County. *See Iowa Pathology Associates v. Abbott*, No. EQCE088372 (Iowa Dist. Ct. Polk Cnty. Dec. 16, 2022). Goldfinch's pathologists filed counterclaims in the state court case alleging many of the same facts at issue here. *See id.*; *see also* Defs.' Ex. A Supp. Mot. Dismiss 21–39, ECF No. 11-2. Goldfinch itself, however, is not a party to the Iowa District Court case. *See Iowa Pathology*, No. EQCE088372.

Goldfinch filed the current action in May 2024. *See* ECF No. 1. In Counts One and Two, Goldfinch alleges a conspiracy to monopolize between IPA and RLC in violation of the Sherman Act, 15 U.S.C. § 1, and Iowa Code § 553.4, respectively. ECF No. 1 ¶¶ 37–46. In Counts Three and Four, Goldfinch alleges attempted monopolization by Defendants in violation of the Sherman Act, 15 U.S.C. § 2, and Iowa Code § 553.5, respectively. *Id.* ¶¶ 47–52.

Defendants move to dismiss Goldfinch's claims. Defs.' Mot. Dismiss, ECF No. 11. Goldfinch resists. Pl.'s Resist. Defs.' Mot. Dismiss, ECF No. 15. On October 7, 2024, the Court held oral argument regarding Defendants' motion to dismiss. *See* Mot. Hr'g Mins., ECF No. 23. At the hearing, attorneys Jack R. Bierig and Margaret A. Hanson represented Goldfinch. *Id.* Attorneys Jennifer E. Lindberg, Michael A. Dee, and Rebecca E. Coleman represented Defendants. *Id.*

Having considered the parties' briefing and arguments of counsel, the Court grants Defendants' motion to dismiss for the reasons set forth below.

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim if a party fails "to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *accord Kelly v. City of Omaha*, 813 F.3d 1070, 1075 (8th Cir. 2016). The aim of the plausibility standard "is to give the opposing party 'fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.'" *Topchian*, 760 F.3d at (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999)).

Plaintiffs must "nudge[ ] their claims across the line from conceivable to plausible, [else] their complaint must be dismissed." *Twombly*, 550 U.S. at 570. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

"Though matters outside the pleading may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 791 (8th Cir. 2014) (quoting *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012)).

> While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned."

*Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (quoting 5B Wright & Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2004)).

The Court must accept as true all factual allegations in the complaint but not its legal conclusions. *Iqbal*, 556 U.S. at 678–79. "In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences most favorably to the complainant." *United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.*, 690 F.3d 951, 955 (8th Cir. 2012).

### IV. DISCUSSION

Iowa antitrust laws are construed to be consistent with federal antitrust laws. Iowa Code § 553.2 ("[The Iowa Competition Law] shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter."). Defendants seek dismissal of Goldfinch's state claims under Iowa Competition Law for the same reasons they argue the claims under the Sherman Act should be dismissed. Defs.' Br. Supp. Mot. Dismiss 17–18, ECF No. 11-1. As such, the Court's discussion as to Counts One and Three (Sherman Act §§ 1 & 2) applies equally to Counts Two and Four (Iowa Code §§ 553.4 & 553.5).

Defendants argue Goldfinch lacks standing. *Id.* at 3–8. Defendants also assert Goldfinch has failed to adequately plead their state and federal claims. *Id.* at 9–18. The Court first considers Defendants' standing arguments. Next, the Court considers Goldfinch's Counts One and Two, alleging a conspiracy to monopolize between IPA and RLC. The Court then turns to Goldfinch's Counts Three and Four alleging attempted monopolization by Defendants.

#### A. Statutory Standing

Defendants argue Goldfinch lacks standing because Goldfinch has not alleged an "antitrust injury" cognizable under antitrust laws. ECF No. 11-1 at 5–7. An antitrust injury is an injury that harms competition generally. *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1151 (9th Cir. 2003) ("Where the defendant's conduct harms the plaintiff without adversely affecting

6

competition generally, there is no antitrust injury."). Defendants assert even if Goldfinch has alleged an antitrust injury, it is not the proper plaintiff to bring this suit. *Id.* at 7–8. Goldfinch responds that Defendants' actions harm competition generally and not just Goldfinch itself. ECF No. 15 at 4–7. Goldfinch also asserts it is an efficient enforcer of antitrust laws because the injury to it is direct, Goldfinch is a competitor in the affected market, and there is no risk of duplicate recovery or complex apportionment for the injury to Goldfinch. *Id.* at 7–8.

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. The Sherman Act "directs itself not against conduct, which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does not do so out of solicitude for private concerns but out of concern for the public interest." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).

To state a claim under the Sherman Act, a plaintiff must allege facts demonstrating statutory standing in addition to Article III standing. *See Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 809 (8th Cir. 1987) (discussing statutory standing under the Sherman Act). Article III standing addresses "the constitutional power of a federal court to resolve a dispute," while statutory standing pertains to whether "Congress . . . has accorded *this* injured plaintiff the right to sue the defendant to redress [the plaintiff's] injury." *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d at 934 (internal quotation marks and citation omitted). "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Assoc. Gen. Contractors of Cal. Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983). Whether a plaintiff has statutory standing to bring an antitrust claim "requires an evaluation of the plaintiff's harm, the alleged wrongdoing by the defendant, and the relationship between them." *Gen. Indus. Corp.*, 810 F.2d at 809. The Court must determine whether the plaintiff

is "the target of the anticompetitive activity, not one who has merely suffered indirect, secondary, or remote injury." *Midwest Commc'ns v. Minn. Twins, Inc.*, 779 F.2d 444, 451 (8th Cir. 1985) (internal quotation marks and citation omitted).

In evaluating a plaintiff's statutory standing, the Court considers: 1) the causal connection between the alleged antitrust violation and harm to the plaintiff, and whether that harm was intended; 2) whether the alleged harm is of a type Congress sought to redress in providing a private remedy for violations of the antitrust laws; 3) the directness of the alleged antitrust injury; 4) the existence of more direct victims of the alleged antitrust injury; and 5) problems of identifying damages and apportioning them among those directly and indirectly harmed. *Assoc. Gen. Contractors of Cal.*, 459 U.S. at 537–45; *accord Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 520 (8th Cir. 1992). "The first two of these antitrust-standing factors together encompass the concept of 'antitrust injury.'" *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007); *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977). The other three factors focus on the directness or remoteness of the plaintiff's alleged antitrust injury. *Novell, Inc.*, 505 F.3d at 311.

"[A]ntitrust injury is a threshold issue that plaintiffs must establish in order to have standing to sue under the antitrust laws." *Fischer v. NWA, Inc.*, 883 F.2d 594, 597 n.5 (8th Cir. 1989). "An antitrust injury is 'injury of the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1144–45 (8th Cir. 2011) (quoting *Brunswick Corp.*, 429 U.S. at 489). "[I]f there is no showing of injury, or if the injury alleged . . . is not an 'antitrust injury,' the plaintiff does not have a claim cognizable under the antitrust laws." *Midwest Commc'ns*, 779 F.2d at 450. An antitrust injury represents "the type of loss that the claimed violations . . . would be likely to cause." *Brunswick Corp.*, 429 U.S. at 489. "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the

defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by violation." *Brunswick Corp.*, 429 U.S. at 489. An "injury, although causally related to an antitrust violation, . . . will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive [behavior] . . . , since it is inimical to the antitrust laws to award damages for losses stemming from continued competition." *Atl. Richfield Co.*, 495 U.S. at 334 (cleaned up). "[T]he antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws." *Cargill, Inc.*, 479 U.S. at 116.

Most of Goldfinch's alleged harms are not antitrust injuries. *Cf. Assoc. Gen. Contractors of Cal.*, 59 U.S. at 537–45; *Atl. Richfield Co.*, 495 U.S. at 344. Goldfinch alleges Defendants unsuccessfully pressured Goldfinch's pathologists to sign a noncompetition agreement; locked Goldfinch's pathologists out of their offices; refused to share biopsy slides; falsely represented to potential clients Goldfinch would not exist in a year; told potential referral sources that Defendants held an exclusive contract with them, when they did not; had one of their pathologists or a pathologist's spouse post false negative reviews on Google; falsely represented Goldfinch may lose test results and delay in reporting results; falsely represented Goldfinch was not legally allowed to exist; falsely told referral sources Goldfinch had no courier service; and falsely stated Goldfinch pathologists only practice dermatopathology as opposed to pathology generally. ECF No. 1 ¶¶ 22–30. As a result of Defendants' alleged conduct, Goldfinch asserts its ability to compete has been severely undermined and "has the potential to harm patients." *Id.* ¶ 31. These injures are not antitrust injuries because they do not stem from conduct affecting competition in the pathology and dermatopathology markets generally. *Cf. Cargill, Inc.*, 479 U.S. at 116; *Atl. Richfield Co.*, 495 U.S. at 344. These injuries, instead, are a result of Defendants' alleged actions

9

targeting Goldfinch and demonstrate an injury to Goldfinch as a competitor—the loss of some patients and referral sources. *Cf. Fair Isaac Corp.*, 650 F.3d at 1144–45.

The possible exception to this is Goldfinch's allegation that Defendants falsely told potential referral sources that Defendants held exclusive contracts with them. ECF No. 1 ¶ 26. This act could cause harm to the pathology and dermatopathology markets because it would dissuade those referral sources from using other pathologists—not just Goldfinch. This injury is of the type Congress intended to prevent because it deprives all competitors the ability to compete. *Cf. Assoc. Gen. Contractors of Cal.*, 459 U.S. at 538 ("As the legislative history shows, the Sherman Act was enacted to assure customers the benefits of price competition . . . ."). Unlike the other alleged actions, this act by Defendants causes harm to competition generally and is potentially a cognizable antitrust injury. *See Brown Shoe Co.*, 370 U.S. at 320 ("[T]he legislative history illuminates congressional concern with the protection of competition, not competitors . . . .").

Nonetheless, even when there is a cognizable antitrust injury, not every person is the proper plaintiff to bring an antitrust suit. Here, Goldfinch is not a proper plaintiff to bring suit for the alleged injuries to pathology and dermatopathology consumers. *See Novell, Inc.*, 505 F.3d at 311; *cf. Assoc. Gen. Contractors of Cal.*, 459 U.S. at 537–45. Goldfinch alleges Defendants' actions caused the fees for pathology and dermatopathology services to be in "excess of competitive levels" and thereby "harm patients and other payors for those services." ECF No. 1 ¶ 35. Goldfinch also alleges that as a result of Defendants' actions, it is has lost around $3.3 million. *Id.* ¶ 36. However, Goldfinch's injuries are remote. *Cf. Brunswick Corp.*, 429 U.S. at 489. Any competitive action between two entities in the same market is likely to cause some level of profit loss, but this does not entitle the losing entity to have standing to sue for antitrust injuries. *Cf. Assoc. Gen. Contractors of Cal.*, 459 U.S. at 537–45. Further, Goldfinch is not paying the alleged higher prices—consumers of pathology and dermatopathology services are. "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the

10

public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." *Assoc. Gen. Contractors of Cal.*, 459 U.S. at 542. As such, even if Goldfinch properly alleged at least one antitrust injury, Goldfinch—as a provider of these services—is not the appropriate plaintiff to sue for the alleged harms due to its remoteness to those harms. *Cf. id.* at 537–45.

Because Goldfinch is not the proper plaintiff to bring an antitrust suit, the Court grants Defendants' motion to dismiss for lack of statutory standing. Notwithstanding the lack of statutory standing, the Court address below whether Goldfinch states a plausible claim for conspiracy to monopolize or attempted monopolization.

### B. Conspiracy to Monopolize (Counts One and Two)

Goldfinch alleges Defendants conspired to monopolize the market for pathology and dermatopathology within central Iowa in violation of § 1 of the Sherman Act and Iowa Code § 553.4. ECF No. 1 ¶¶ 37–46. Defendants argue these claims should be dismissed because Goldfinch does not allege IPA and RLC are separate entities capable of conspiring for purposes of § 1 of the Sherman Act. ECF No. 11-1 at 9–11; Defs.' Reply Supp. Mot. Dismiss 3–4, ECF No. 18. Goldfinch responds, stating IPA and RLC are functionally distinct and thus capable of conspiring. ECF No. 15 at 8–11. Goldfinch further argues it is too early at this stage in litigation to dismiss these claims because additional factual development is needed. *Id.* at 11–12.

A § 1 violation occurs where there is a "contract, combination, . . . or conspiracy, in restraint of trade or commerce among the several States . . . ." 15 U.S.C. § 1. This section, however, does not apply to coordinated behavior between a parent company and its wholly owned subsidiary. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 776–77 (1984). "[I]t is not determinative that two parties to an alleged § 1 violation are legally distinct entities." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 196 (2010). Instead, in analyzing whether a § 1 violation occurred, "[t]he relevant inquiry . . . is whether there is a 'contract, combination . . .

, or conspiracy' amongst 'separate economic actors pursuing separate economic interests,' such that the agreement 'deprives the marketplace of independent centers of decisionmaking,' and therefore of 'diversity of entrepreneurial interests,' and thus of actual or potential competition." *Id.* at 195 (cleaned up) (citations omitted).

The *American Needle* Court found the thirty-two different teams within the National Football League conspired in violation of § 1 of the Sherman Act with one another as part of an incorporated joint venture. *Id.* at 201–03. The teams jointly formed the National Football League Properties (NFLP) to develop, license, and market their intellectual property. *Id.* at 187. The NFLP granted an exclusive license to a corporation to manufacture and sell trademarked headwear for all thirty-two teams. *Id.* This joint venture violated § 1 because the teams were "separately controlled" and "potential competitors" whose economic interests may diverge from the NFLP. *Id.* at 201. This exclusive license thus "deprive[d] the marketplace of independent centers of decisionmaking." *Id.* at 195.

Goldfinch similarly argues IPA and RLC are engaged in a joint venture with one another that "joins together independent centers of decisionmaking" in violation of § 1. ECF No. 15 at 9 (quotation marks and citation omitted). Goldfinch asserts IPA and RLC, as separately incorporated entities, are essentially a "nut and bolt" that operate together but have distinct functions. *Id.* at 9–10. This collaboration, according to Goldfinch, allows Defendants to suppress competition and charge supracompetitive prices for their services. *Id.* at 10. In addition, Goldfinch states it expects discovery to show that IPA "employs only technicians and staff" and RLC "employs only pathologists" with each entity performing different functions. *Id.*

Goldfinch, however, does not assert IPA and RLC are or were competitors. That is, Goldfinch does not assert that IPA and RLC are "separate economic actors pursuing separate economic interests." *Am. Needle*, 560 U.S. at 195. Unlike in *American Needle*, IPA and RLC are not alleged to be "separately controlled" such that a joint venture by them would "deprive

12

the market place of independent centers of decisionmaking." *Id.* at 195, 201. Instead, Goldfinch alleges that RLC is an affiliate of IPA and is comprised of the same pathologists at IPA. ECF No. 1 ¶ 2. Though not dispositive of § 1 violations, Goldfinch also alleges Defendants share their profits with each other. *Id.*; *but see Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 817 F.3d 934, 942 (6th Cir. 2016) ("[I]f the fact that potential competitors shared in profits or losses from a venture meant that the venture was immune from § 1, then any cartel could evade the antitrust laws simply by creating a 'joint venture' to serve as the exclusive seller of their competing products." (quotation marks and citation omitted)). Defendants thus have a unity of interest and are incapable of conspiring under § 1. *Cf. Copperweld*, 467 U.S. at 771. Relatedly, Goldfinch's assertions that IPA and RLC employ different types of employees is not relevant. The types of employees hired do not indicate whether IPA and RLC are independent centers of decisionmaking who, by working together, would deprive the marketplace of actual or potential competition. *Cf. Am. Needle*, 560 U.S. at 195.[1]

Finally, the exhibit attached to the complaint also cuts against the notion that IPA and RLC are or were separately controlled or that they have independent centers of decisionmaking. The "EMPLOYMENT AGREEMENT" that Goldfinch states its pathologists were pressured to sign refers to IPA and RLC collectively as "Employer" as opposed to "Employers." Ex. 1, ECF No. 1-1 at 1. The agreement also states the "Executive Committee"—singular—will decide various terms therein. *Id.* at 3, 6, 8. That is, Defendants appear to operate jointly under a single executive committee. Any alleged agreement or conspiracy between IPA and RLC would thus not be capable of violating § 1.

For the foregoing reasons, even assuming Goldfinch has standing, the Court grants

---

[1] Additionally, Goldfinch's allegation that IPA "employs only technicians and staff" runs contrary to the complaint which alleges IPA provides services "through its pathologists." ECF No. 11 at 10; ECF No. 1 ¶ 2. That is, the complaint alleges IPA employs pathologists as well.

13

Defendants' motion to dismiss with respect to Count One. Because the Iowa Competition Law is construed in accordance with federal antitrust laws, the Court also grants Defendants' motion to dismiss with respect to Count Two. *See* Iowa Code § 553.2.

### C.  Attempted Monopolization (Counts Three and Four)

Goldfinch argues Defendants violated § 2 of the Sherman Act and attempted to monopolize the pathology and dermatopathology markets in central Iowa. ECF No. 1 ¶¶ 47–49. Goldfinch also alleges Defendants' actions violated Iowa Competition Law, Iowa Code § 553.5, for the same reasons. *Id.* ¶¶ 50–52. Defendants move to dismiss these claims, asserting Goldfinch has not adequately alleged: 1) a product market, 2) a geographic market, 3) Defendants' intent to monopolize the relevant markets, or 4) Defendants' anticompetitive or predatory behavior. ECF No. 11 at 11–15. Goldfinch resists. ECF No. 15 at 12–17.

To demonstrate a violation of § 2 of the Sherman Act for attempted monopolization, a plaintiff must show the defendant engaged in "[(1)] predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc.*, 506 U.S. at 456; *see also Gen. Indus. Corp.*, 810 F.2d at 801. To state a claim under § 1 or § 2 of the Sherman Act, a plaintiff must plead a relevant market. *Double D Spotting Serv. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998). "It is the plaintiff's burden to define the relevant market." *Id.* (citation omitted). "Antitrust claims often rise or fall on the definition of the relevant market." *Par v. Wolfe Clinic, P.C.*, 70 F.4th 441, 447 (8th Cir. 2023) (citation omitted). "The definition of the relevant market has two components—a product market and a geographic market." *Double D Spotting Serv.,* 136 F.3d at 560 (citation omitted).

As discussed below, Goldfinch fails to adequately allege a relevant market for pathology and dermatopathology services. As such, the Court declines to analyze whether Goldfinch has properly alleged the other requirements for attempted monopolization.

1. **Product market**

"The boundaries of the product market can be determined by the reasonable interchangeability . . . of demand between the product itself and possible substitutes for it." *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007). Courts employ the "hypothetical monopolist test" to determine whether a plaintiff has sufficiently defined the relevant product market. *Fed. Trade Comm'n v. Sanford Health*, 926 F.3d 959, 963 (8th Cir. 2019). "The test asks whether a hypothetical monopolist could impose a 'small but significant nontransitory increase in price' in the proposed market." *Id.* (quoting *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015)). "If consumers would defeat the price increase by switching to products outside of the proposed market, then the market definition is too narrow and must be redefined." *Id.*

Defendants argue "pathology services" is interchangeable with other hospital services and is thus not a valid product market. ECF No. 11-1 at 12–13. This argument, however, is premised on a case from the Seventh Circuit where a pathologist sued a specific hospital for *inter alia* an unlawful tying arrangement between the hospital and an independent pathology group. *See Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 474–75 (7th Cir. 1988). *Collins* found there was no separate consumer demand by individual patients for pathology services at that specific hospital. *Id.* at 480. Here, however, there is a demand for independent pathology and dermatopathology services as evidenced by Defendants' entire practice. Defendants do not explain how consumers—either patients or referral sources—could defeat a nontransitory price increase imposed for independent pathology and dermatopathology services by switching to other hospital services. *See* ECF No. 11-1 at 12–13.

Defendants also argue that Goldfinch does not address the variety of locations and private laboratories from which pathology can be obtained by consumers. ECF No. 11-1 at 13. The Court addresses this line of argument below when discussing the relevant geographic market.

Based on Goldfinch's complaint, and because Defendants are able to exist as their own independent pathology group, the Court finds it reasonable to infer independent pathology and dermatopathology services are a valid product market for purposes of an antitrust claim.

### 2. Geographic market

"The court must determine whether the plaintiff has alleged a geographic market that includes: (1) 'the area in which a defendant supplier draws a sufficiently large percentage of its business' and (2) 'a geographic market in which only a small percentage of purchasers have alternative suppliers to whom they could practically turn in the event that a defendant supplier's anticompetitive actions result in a price increase.'" *Par*, 70 F.4th at 447 (quoting *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 598 (8th Cir. 2009)). That is, a properly defined geographic market is one that includes areas where "consumers can practically seek alternative sources of the product." *Double D Spotting Serv.*, 136 F.3d at 560. This inquiry "considers the extent to which customers will travel in order to *avoid* doing business [with the defendant]." *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 346 (8th Cir. 1995) (citation omitted). "Without a well-defined relevant [geographic] market, a court cannot determine the effect that an allegedly illegal act has on competition." *Little Rock Cardiology*, 591 F.3d at 596.

Generally, "courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery, because the proof of illegal conduct lies largely in the hands of the alleged antitrust conspirators." *Double D Spotting Serv.*, 136 F.3d at 560. "Most often, proper [geographic] market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Id.* (quotation marks and citation omitted). Nonetheless, this general rule does not constitute "a *per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market under Fed. R. Civ. P. 12(b)(6)." *Id.* (citation omitted). "[C]ourts have not hesitated to dismiss antitrust claims where it is clear the alleged geographic market is too narrow, implausible, . . . or simply not defined anywhere in the pleadings." *Ferguson Med. Grp., L.P. v.*

*Missouri Delta Med. Ctr.*, No. 1:06 CV 8 CDP, 2006 WL 2225454, at *3–5 (E.D. Mo. Aug. 2, 2006); *see also Acre v. Spindletop Oil & Gas Co.*, No. 4:09CV00421 JLH, 2009 WL 4016116, at *6–8 (E.D. Ark. Nov. 18, 2009) (dismissing where the geographic market's definition is implausible). Additionally, the concerns held by courts uncertain about granting a motion to dismiss in antitrust cases are not present here. Goldfinch is comprised of four pathologists who previously worked for Defendants. ECF No. 1 ¶ 4. These pathologists stopped working for Defendants in January 2023. *Id.* As such, they are intimately familiar with the inner workings of Defendants' operations and have the unique ability to know the "commercial realities" faced by consumers and the extent of Defendants' operations. *Cf. Double D Spotting Serv.*, 136 F.3d at 560. Nonetheless, the complaint only defines the relevant geographic market as "central Iowa." ECF No. 1 ¶¶ 38, 44, 48, 51. The complaint does not specify what this area encompasses nor does it offer a reason for limiting the geographic market to central Iowa. *See generally* ECF No. 1.

Goldfinch makes three arguments as to why "central Iowa" is sufficiently defined. ECF No. 15 at 13–15. None of them are sufficient to plausibly explain why consumers cannot practicably turn to sources outside central Iowa. *See Par*, 70 F.4th at 447; *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557. First, Goldfinch argues central Iowa is sufficiently defined because the complaint alleges the absence of alternative suppliers of independent pathology services. ECF No. 15 at 13–15. Addressing potential alternative suppliers of the relevant product is necessary to properly plead a relevant geographic market. *See Par*, 70 F.4th at 447. The inquiry, however, does not end with merely reciting potential alternative suppliers—the complaint must address "alternative suppliers to whom [consumers] could *practicably turn* in the event a defendant's anticompetitive actions result in a price increase." *Id.* (emphasis added) (citation omitted). Here, Goldfinch addresses the potential alternatives for university-affiliated pathologists. ECF No. 1 ¶ 12. But Goldfinch does not address *why* potential referral sources are unable to send specimens

17

to areas outside central Iowa, however that may be defined.² *Cf. Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 164 F. Supp. 3d 1117, 1126 (D. Minn. 2016) (finding the complaint sufficiently alleged a geographic market because "factors such as transportation costs, currency exchange rates, and developing packaging designs remotely are hurdles to consumers looking to" alternative suppliers outside the complaint's defined geographic market). In fact, Goldfinch's complaint alleges specimens analyzed by Goldfinch's and Defendants' pathologists travel "in interstate commerce." ECF No. 1 ¶ 6 ("The acts and practices of defendants challenged in this action are in, and affect, interstate commerce . . . because some of the specimens analyzed by pathologists at both Goldfinch and IPA are sent in interstate commerce."). This means specimens, at a minimum, can travel long distances, but Goldfinch provides no explanation alleging why consumers cannot practicably turn to other pathologists or dermatopathologists outside central Iowa. *Cf. Par*, 70 F.4th at 447.

Goldfinch next asserts that "potential referral sources in central Iowa almost always send, and strongly prefer to send, general pathology and dermatopathology specimens" to Defendants. ECF No. 15 at 15. But "[t]he proper inquiry is not where customers *prefer* to travel, but instead, where there are actual alternatives for services." *Par*, 70 F.4th at 448 (citing *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir. 1994)). Even if potential referral sources in central Iowa almost always send their specimens to Defendants, that still does not address why those referral sources are practicably incapable of sending specimens outside of central Iowa. *Cf. id.* at 447–48.

---

² On October 30, 2024, the Court received a letter from Goldfinch's counsel. *See* Pl.'s Letter to the Court, ECF No. 25. The letter described "central Iowa" as a "box" with the corners comprised of four Iowa cities. *Id.* It appears counsel is attempting to amend the complaint through this letter. This, however, is not a proper method for amending a complaint. This letter does not factor into the Court's considerations. Even accepting Goldfinch's "box" as an accurate description of central Iowa, the upper-right corner of the box is Waterloo, Iowa which is approximately 110 miles from Des Moines, Iowa (where Defendants are based). *See* ECF No. 25. Omaha, Nebraska, is approximately 130 miles from Des Moines and Iowa City, Iowa is approximately 115 miles from Des Moines. Goldfinch does not give any reason why consumers in central Iowa could not practicably turn to independent pathologists or dermatopathologists in these cities.

The last argument Goldfinch makes is that the twenty-five-mile radius for the noncompetition agreement shows Defendants' face no competition from outside central Iowa. ECF No. 15 at 15. Goldfinch reasons that if Defendants faced competition from outside central Iowa, the noncompetition agreement would have extended beyond twenty-five miles. *Id.* The bounds of a noncompetition agreement, however, are not indicative of where potential referral sources realistically can send specimens for analysis. *See* ECF No. 1 ¶ 6 (noting specimens travel in interstate commerce for analysis). Further, Defendants argue the geographic limitations in the noncompetition agreement were included to comport with Iowa law governing noncompetition agreements. ECF No. 18 at 5 n.5. As such, the twenty-five-mile radius does not accurately detail the requirements for a valid geographic market. *See Par*, 70 F.4th at 447.

Even assuming central Iowa is where Defendants draw a sufficiently large portion of their business, Goldfinch has not sufficiently alleged a plausible reason why potential referral sources cannot practically turn to alternative sources outside central Iowa. *Cf. Par*, 70 F.4th at 447–48. Goldfinch has not met its burden to plausibly define the relevant geographic market. *Double D Spotting Serv.*, 136 F.3d at 560; *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557. Goldfinch thus fails to allege facts regarding the second component required to adequately allege a geographic market. Goldfinch has not plausibly identified a relevant market as required to allege attempted monopolization.

As such, the Court declines to consider whether Goldfinch properly alleges the other aspects of attempted monopolization. For the foregoing reasons, the Court grants Defendants' motion to dismiss with respect to Counts Three and Four. Additionally, even if Defendants were capable of conspiring for purposes of § 1, Goldfinch's failure to properly define the relevant market serves as an independent reason for granting Defendants' motion to dismiss with respect to Counts One and Two. *See Double D Spotting Serv.*, 136 F.3d at 560.

## V. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Defendants Iowa Pathology Associates, P.C. and Regional Laboratory Consultants, P.C.'s Motion to Dismiss, ECF No. 11, is **GRANTED**.[3]

**IT IS SO ORDERED.**

Dated this 13th day of December, 2024.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE

---

[3] Although a court "should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15, "a district court does not abuse its discretion in denying leave to amend where the plaintiff 'made no motion for leave to amend and did not explain the substance of [their] proposed amendment.'" *United States ex rel. Ambrosecchia v. Paddock Lab'ys, LLC*, 855 F.3d 949, 956 (8th Cir. 2017) (citation omitted). A court may deny leave to amend where "there are compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment." *Reuters v. Jax Ltd., Inc.*, 711 F.3d 918, 922 (8th Cir. 2013) (citation omitted). Here, Goldfinch has not made a proper motion under Rule 15 seeking leave to amend its complaint. Instead, Goldfinch mentioned in passing during oral argument it could amend the complaint if the Court wanted. *See* ECF No. 23. Goldfinch also states in its letter that "if the Court concludes that any of the allegations of the complaint were insufficiently detailed to survive a motion to dismiss, I would respectfully request leave to file an amended complaint." ECF No. 25. Neither is the appropriate manner to move for leave to amend. *See* Fed. R. Civ. P. 15. Goldfinch also has not detailed what new information the amended complaint would include that would address the previously discussed deficiencies within the complaint. As such, the Court cannot determine whether the subsequent amendment would result in undue delay, cause undue prejudice to Defendants, or be futile. *Cf. Reuter*, 711 F.3d at 922. The Court thus denies Goldfinch's oral request to amend. *Cf. Ambrosecchia*, 855 F.3d at 956.

20